PAUL KELLY, JR., Circuit Judge.
Plaintiff-Appellant, Betty Pinkerton, appeals from the grant of summary judgment in her employment discrimination action. Ms. Pinkerton was employed by Defendanh-Appellee, the Colorado Department of Transportation (“CDOT”), from April 1995 until her termination on March 27, 2003. Prior to Ms. Pinkerton’s termination, her superiors within CDOT had held multiple meetings regarding her substandard performance and had sought to have her transferred elsewhere for employment. In addition, a few months before being terminated, Ms. Pinkerton had also been subjected to sexually oriented comments by her male supervisor. In response to her termination, Ms. Pinkerton brought sex discrimination and retaliation claims against CDOT pursuant to Title VII of the Civil Rights Act of 1964 (“Title VII”). Following discovery, the district court granted CDOT’s motion for summary judgment as to each of Ms. Pinkerton’s claims.
On appeal, Ms. Pinkerton makes three major claims which, she argues, requires reversal of the district court order. Ms. Pinkerton contends that (1) the district court incorrectly applied the summary judgment standard by construing evidence and resolving factual issues in favor of the movant; (2) the district court incorrectly applied the concept of vicarious employer liability for sexual harassment and improperly weighed the evidence in doing so; and (3) the district court improperly adjudicated the retaliation claim by ignoring evidence of pretext and resolving contested factual issues. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

Ms. Pinkerton was hired by CDOT as an Administrative Assistant II (“AA II”) in April 1995. From 1995 until 2000, Ms. Pinkerton was supervised by Mr. Scott Ellis. In 2000, CDOT reallocated Ms. Pinkerton’s position to AA III, based on the job duties that Ms. Pinkerton performed rather than on the quality of her work in performing those duties. At the same time, CDOT also reassigned the supervision of Ms. Pinkerton from Mr. Ellis to Mr. David Martinez, which pleased Ms. Pinkerton because Mr. Ellis had resisted the reallocation of Ms. Pinkerton’s position. Because of Ms. Pinkerton’s new job category, she was expected to take on new duties and was provided certain new “Individual Performance Objectives” (“IPOs”). In addition, Ms. Pinkerton was to have “progress meetings” with Mr. Martinez every three weeks. After the transfer, however, Mr. Ellis — who still worked with Ms. Pinkerton — observed a significant decline in Ms. Pinkerton’s performance.[1]
*1056 This decline is also evident from the evaluations of ■ Ms. Pinkerton that Mr. Martinez provided. In his notes for the August 21, 2000, progress meeting, Mr. Martinez documented a number of issues similar to those reported in the past by Mr. Ellis. Mr. Martinez noted that Ms. Pinkerton lacked a willingness to do requested work, had problems with her attitude and cooperation, failed to properly prioritize assignments, and lacked organizational and grammar skills. Mr. Martinez’s notes from the September 12, 2000, and September 29, 2000, meetings contained similar comments. Based on these reports, CDOT held an R-6-10[2] meeting to review Ms. Pinkerton’s performance. Mr. Richard Gabel, Mr. Martinez’s superi- or, issued a corrective action for Ms. Pinkerton after finding that she had failed to “carry out certain job duties in a satisfactory manner.” The corrective action identified five performance areas in which Ms. Pinkerton had to improve and warned that failure to improve would result in further disciplinary action. In April 2001, Mr. Martinez gave Ms. Pinkerton an overall rating of “needs improvement”; again, the report noted Ms. Pinkerton’s need to improve working relations, prepare timely and accurate reports, reduce errors, and set priorities.
Ms. Pinkerton’s continued poor performance led to another R-6-10 hearing on April 16, 2001; at the hearing, Ms. Karla Harding, CDOT’s Regional Director, demoted Ms. Pinkerton to AA II. Accordingly, Mr. Martinez issued a memorandum on September 7, 2001, setting forth Ms. Pinkerton’s new duties as an AA II. Ms. Pinkerton filed a grievance regarding the disciplinary action and was granted a hearing. As a result of the hearing, Ms. Pinkerton and CDOT entered into a settlement agreement. The agreement required Ms. Pinkerton to adhere to IPOs reflecting the duties highlighted in the September 7, 2001, memorandum and allowed her a certain number of errors per month in different objective categories. The new IPOs were to be used to evaluate Ms. Pinkerton’s performance. Ms. Pinkerton was satisfied with the settlement agreement because it provided an objective basis by which her performance was to be evaluated.
However, Ms. Pinkerton’s performance did not improve following the settlement agreement. The monthly progress review meetings revealed that Ms. Pinkerton exceeded the number of errors that she was allowed in multiple categories. Mr. Martinez provided written documentation of the errors, and Ms. Pinkerton acknowledges that a “good number” of her errors were reported by other people to Mr. Martinez. Then, in Ms. Pinkerton’s 2002 evaluation, Mr. Martinez gave Ms. Pinkerton an overall rating of “needs improvement.” Again, Mr. Gabel issued a corrective action, giving her four months to improve. However, Ms. Pinkerton continued to exceed the number of allowable errors in her monthly progress reviews, as demonstrated by the supporting documentation provided by Mr. Martinez.
On October 15, 2002, as required by the corrective action plan, Mr. Martinez sent Mr. Gabel a memorandum summarizing Ms. Pinkerton’s lack of improvement and tabulating her errors. Knowing that she was in danger of losing her job, Ms. Pinkerton requested a meeting with Mr. Gabel and Ms. Wendy Miller. At the November 7, 2002, meeting, Ms. Pinkerton asked Mr. Gabel for time to look for a new job. Mr. Gabel agreed, and offered to help her look for a new job. Ms. Harding subsequently found a position in Denver that Ms. Pinkerton could have for a trial period.
*1057 After the November 7, 2002, meeting, however, Mr. Martinez began making inappropriate, sexually oriented remarks to Ms. Pinkerton. In December, 2002, Mr. Martinez asked Ms. Pinkerton questions such as, “How can you be divorced so long and be without men?” and “Don’t you get urges?” Ms. Pinkerton testified that these questions made her feel sick to her stomach. On January 6, 2003, after observing a man walk past Ms. Pinkerton’s office and wave to her, Mr. Martinez asked Ms. Pinkerton whether she “ha[d] anything going on with the man that just waved.” The same day, Mr. Martinez asked her what her breast size was. On another occasion, Mr. Martinez asked Ms. Pinkerton if she masturbated and if she had breast enlargements. Mr. Martinez also told Ms. Pinkerton that he liked it when she wore skirts and tried to tell her a story about a married woman who “came on” to him. Ms. Pinkerton testified that the last inappropriate comments by Mr. Martinez occurred the week prior to February 21, 2003, when he made comments about her ex-husband and children, and asked to go to her house for lunch.
Ms. Pinkerton called Mr. Eugene Trujillo, CDOT’s internal civil rights administrator, to report Mr. Martinez’s comments on February 19, 2003. Mr. Trujillo was the first person she informed about the comments. She then filed a formal written complaint on February 24, 2003. Ms. Harding received notice of the complaint on February 26, 2003.
These events were followed by Ms. Pinkerton’s meeting on February 27, 2003, with Mr. Gabel and Ms. Miller to discuss the job transfer. To the surprise of Mr. Gabel and Ms. Miller, Ms. Pinkerton turned down the reassignment to Denver, asserting that her current job was “fine.” Despite having told Mr. Gabel previously that she would be willing to go to Denver, Ms. Pinkerton claimed that she no longer wanted to work in Denver because it was too far away. Ms. Pinkerton reconfirmed this decision in an e-mail on March 3, 2003. Accordingly, Mr. Gabel formally requested on March 7, 2003, that disciplinary action resume against Ms. Pinkerton. Ms. Harding then scheduled an R-6-10 meeting for March 13, 2003. At the meeting, Ms. Pinkerton did not mention the sexual harassment, and only presented a few emails and letters in her own defense.
Events unfolded rapidly thereafter. On March 18, 2003, Ms. Harding learned from the EEO that Ms. Pinkerton’s sexual harassment complaint might be justified and immediately removed Mr. Martinez as Ms. Pinkerton’s supervisor. Three days later, on March 21, 2003, Ms. Harding received Mr. Trujillo’s investigation report, which concluded that Mr. Martinez had in fact made the inappropriate comments. Six days after that, on March 27, 2003, Ms. Harding notified Ms. Pinkerton that she had not adequately explained her performance problems and that her employment was terminated. Then, on April 1, 2003, Ms. Harding held an R-6-10 meeting with Mr. Martinez to address his violations of CDOT’s sexual harassment policy. Six days later, on April 7, 2003, Ms. Harding demoted and reassigned Mr. Martinez (resulting in a salary reduction of approximately $1,100 per month), and required him to take a class on sexual harassment. Mr. Martinez apparently was reinstated to his prior position after about eight months.
After her termination, Ms. Pinkerton brought suit against CDOT, raising two claims for relief, namely, sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964. See 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a). The district court found that CDOT was not vicariously liable for the actions of Mr. Martinez because the sexual harassment did not culminate in any tangible employment action. Further, the district court *1058 found that CDOT was not vicariously liable because CDOT had proved by a preponderance of the evidence that it exercised reasonable care to prevent and correct promptly the sexually harassing behavior and that Ms. Pinkerton had unreasonably failed to take advantage of corrective opportunities provided by the employer. Pinkerton v. Colo. Dep’t of Transp., 05-cv-01533-MJW-CBS, 2007 WL 3232601, at *11-12 (D.Colo. Oct.31, 2007). The district court also rejected the retaliation claim because it concluded that Ms. Pinkerton had failed to show that CDOT’s proffered reason for her termination was pretextual. Id. at * 13-14. Accordingly, the district court granted CDOT’s motion for summary judgment. Id. at * 14. Ms. Pinkerton now appeals.

Discussion

We review the grant of summary judgment de novo and apply the same standard as the district court. T-Mobile Cent., LLC v. Unified Gov’t of Wyandotte County, 546 F.3d 1299, 1306 (10th Cir.2008) (citing Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1112 (10th Cir.2007)). Rule 56(c) of the Federal Rules of Civil Procedure instructs that summary judgment is appropriate if “there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); T-Mobile, 546 F.3d at 1306. In making this determination, we “examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party.” T-Mobile, 546 F.3d at 1306 (citations omitted). At this stage, “[cjredibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson, 477 U.S. at 255, 106 S.Ct. 2505. However, “[wjhere the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no ‘genuine issue for trial.’ ” Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
A. Title VII Sex Discrimination Claim
Pursuant to Title VII, it is “an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual’s ... sex.” 42 U.S.C. § 2000e-2(a)(l). An individual can make a claim of sex discrimination based on a hostile work environment, Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), but in order to do so, “a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment.” Medina v. Income Support Div., 413 F.3d 1131, 1134 (10th Cir.2005); see EEOC v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir.2007). Because CDOT does not argue for summary judgment purposes that Mr. Martinez’s comments did not create a hostile work environment, the only question before us is whether CDOT is vicariously liable for that environment.
An employer may be vicariously liable[3] to a victimized employee for an actionable hostile work environment creat *1059 ed by a supervisor with immediate (or successively higher) authority over the employee in either of two situations. Penn. State Police v. Suders, 542 U.S. 129, 143-46, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). First, the employer is vicariously liable when “the supervisor’s harassment culminates in a tangible employment act, such as discharge, demotion, or undesirable reassignment.” Ellerth, 524 U.S. at 765, 118 S.Ct. 2257. In that situation, the employer has no affirmative defense available. Id. Second, an employer may be vicariously liable for a hostile work environment, even absent a tangible employment action. However, in that circumstance, the employer will not be liable if it proves the following affirmative defense by a preponderance of the evidence: (1) it “exercised reasonable care to prevent and correct promptly any sexually harassing behavior,” and (2) the plaintiff “unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Id.; see Faragher, 524 U.S. at 807,118 S.Ct. 2275.
1. Tangible Employment Action
Ms. Pinkerton contends that the Ellerth/Faragher affirmative defense should not apply because the sexual harassment by her supervisor, Mr. Martinez, culminated in a tangible employment action, namely, her termination after having received poor evaluations from Mr. Martinez. Ms.
Pinkerton’s termination, if caused by Mr. Martinez, would certainly qualify as a tangible employment action, given that the Supreme Court defined that term to include “significant change[s] in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.” Ellerth, 524 U.S. at 761, 118 S.Ct. 2257. Ms. Pinkerton argues that the fact she received relatively good evaluations in the years just prior to Mr. Martinez’s becoming her supervisor shows that Mr. Martinez used the poor evaluations to “groom” her for sexual favors and then had her fired when she did not comply. As confirmation of this theory, Ms. Pinkerton points to the fact that she had net positive reviews during her first five years at CDOT but received net negative reviews under Mr. Martinez. Ms. Pinkerton also argues that Mr. Martinez caused Ms. Harding to fire Ms. Pinkerton under the subsidiary bias (or “cat’s paw”) theory. The district court rejected these arguments and found that the harassment did not culminate in the poor evaluations and termination. Pinkerton, 2007 WL 3232601, at *3. We agree. The undisputed facts would not lead a rational trier of fact to conclude that the harassment culminated in tangible employment action.
a. Grooming/Quid Pro Quo Argument
The undisputed facts do not allow for a reasonable inference that Mr. Martinez was grooming Ms. Pinkerton for sexual favors. To survive summary judgment with a grooming / quid pro quo argument,[4] *1060 Ms. Pinkerton must show that a reasonable jury could find Mr. Martinez conditioned concrete employment benefits on her submission to sexual conduct and had her fired when she did not comply. Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413-14 (10th Cir.1987); see Conatzer v. Med,. Profl Bldg. Svcs. Coup., 95 Fed.Appx. 276, 279 (10th Cir.2004) (unpublished). “The gravamen of a quid pro quo sexual harassment claim is that tangible job benefits are conditioned on an employee’s submission to conduct of a sexual nature and that adverse job consequences result from the employee’s refusal to submit to the conduct.” Hicks, 833 F.2d at 1414. Here, as in Hicks, the record fails to support any suggestion that Ms. Pinkerton’s employment was conditioned on sexual favors. See id. Ms. Pinkerton herself admitted that Mr. Martinez never asked for sex, and she even denied suggesting that Mr. Martinez sought to manufacture bad evaluations so that he would be able to sexually harass her.
Although Ms. Pinkerton argues that the mere fact her performance evaluation changed from “net positive” to “net negative” under Mr. Martinez shows that she was being groomed for sexual favors, she never explains why this change was not warranted — and no reasonable trier of fact could escape Ms. Pinkerton’s history of under-performance at CDOT. The undisputed evidence shows that Ms. Pinkerton was failing to comply with the objective performance criteria that Ms. Pinkerton wanted used for her evaluation. Even Ms. Pinkerton acknowledges that Mr. Martinez’s objective evaluations were supported by documentation and were based in large part on the reports of other individuals. Ms. Pinkerton also received complaints directly from engineers about her performance, in addition to those that Mr. Martinez informed her about. Moreover, the record reflects that prior supervisors had identified performance issues like those that Mr. Martinez later identified-including co-worker relations, familiarity with procedures, timeliness, and prioritizing of tasks. Mr. Ellis, a neutral observer, also testified that Ms. Pinkerton’s performance declined once she was transferred to Mr. Martinez’s supervision.
In short, nothing more than speculation suggests that Mr. Martinez, the soon-to-be harasser, manufactured poor evaluations in order to “groom” the harassed individual for sexual favors and fired her when she did not comply. Rather, the evidence shows that multiple individuals observed that Ms. Pinkerton failed to meet her clearly established, objective IPOs in the months leading up to October 2002 — at which time Ms. Pinkerton herself knew that her performance had placed her job in jeopardy. Thus, we do not have a situation where negative performance reviews, generated to secure sexual favors, “culminated” in a tangible employment action.
b. Subordinate Bias/Cat’s Paw Argument
However, Ms. Pinkerton argues that we could find a tangible employment action on the basis of the subordinate bias theory. “To prevail on a subordinate bias claim, a plaintiff must establish more than mere ‘influence’ or ‘input’ in the decision-making process. Rather, the issue is whether the biased subordinate’s discriminatory reports, recommendation, or other actions caused the adverse employment action.” EEOC v. BCI Cocar-Cola Bottling Co., 450 F.3d 476, 487 (10th Cir.2006). Because the plaintiff must demonstrate causation, “an employer can avoid liability by conducting an independent investigation of *1061 the allegations against an employee.” Id. at 488. In fact, we have stated that “simply asking an employee for his version of events may defeat the inference that an employment decision was ... discriminatory.” Id. In applying this standard at the summary judgment stage, we ask first if the plaintiff has established a “genuine issue of material fact concerning the bias of the subordinate.” Id. Second, we ask if the plaintiff has established “genuine issues of material fact as to whether the proffered reason for the employment action is pretextual, which in a subordinate bias claim requires the plaintiff to demonstrate a causal relationship between the subordinate’s actions and the employment decision.” Id.
Ms. Pinkerton’s claim fails both prongs of this standard. First, Ms. Pinkerton has failed to establish a genuine issue of material fact as to the bias of the subordinate. As noted above, Ms. Pinkerton presents absolutely no evidence whatever that Mr. Martinez’s reports and evaluations were biased. The evaluations were supported by documentation, and many of the errors were reported to Mr. Martinez by other individuals. Moreover, as the uncontroverted evidence shows, Ms. Pinkerton’s errors were significant and had been noted by prior supervisors. Ms. Pinkerton provides nothing other than speculation and counsel’s argument to the contrary; and, of course, the argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment. See Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1198 n. 6 (10th Cir.2008) (stating that, “[t]o avoid summary judgment, a party must produce specific facts showing that there remains a genuine issue for trial” and that “mere conjecture” is insufficient (internal quotations omitted)); see, e.g., Fritzsche v. Albuquerque Mun. Sch. Dist., 194 F.Supp.2d 1194, 1206 (D.N.M.2002).
Second, in addition to not establishing a genuine issue regarding bias, Ms. Pinkerton also failed to demonstrate a causal relationship between Mr. Martinez’s actions and Ms. Harding’s employment decision. Ms. Harding met with Ms. Pinkerton for an R-6-10 hearing prior her termination. At the meeting, Ms. Harding asked Ms. Pinkerton if there was anything else she needed to know before making her decision, but Ms. Pinkerton did not dispute the negative performance evaluations or even raise the issue of sexual harassment. Ms. Harding’s request that Ms. Pinkerton give her side of the story is sufficient to defeat any inference that the decision was based on a subordinate’s bias. BCI Coca-Cola Bottling Co., 450 F.3d at 488; see Kendrick v. Penske Transp. Svcs., Inc., 220 F.3d 1220, 1231-32 (10th Cir.2000).
Because Ms. Pinkerton’s termination cannot be traced back to Mr. Martinez through the subordinate bias theory, we cannot conclude that his actions culminated in her termination. Accordingly, CDOT is not vicariously liable for the hostile work environment that Mr. Martinez created. Instead, CDOT can assert the Ellerth/Faragher affirmative defense. See Ellerth, 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807, 118 S.Ct. 2275.
2. Ellerth/Faragher Affirmative Defense
As noted earlier, the affirmative defense recognized by Ellerth and Faragher “comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.” Gunnell v. Utah Valley State Coll, 152 F.3d 1253, *1062 1261 (10th Cir.1998). The district court concluded that CDOT met its burden of proof under the Ellerth/Faragher affirmative defense. Pinkerton, 2007 WL 3232601, at *11-12. We also conclude that summary judgment was properly granted to CDOT on this issue.
a. First Element of the Ellerth / Faragher Affirmative Defense
First, the uncontroverted evidence shows that CDOT exercised reasonable care to prevent and correct promptly Mr. Martinez’s sexually harassing behavior. The parties do not seriously contest whether CDOT unreasonably failed to prevent sexual harassment. CDOT had in place an adequate sexual harassment policy. CDOT’s policy prohibits sexual harassment, identifies the complaint procedure, and informs employees that disciplinary action might be taken against those who violate the policy. In addition to having adopted the sexual harassment policy, CDOT requires its employees to take a four-hour sexual harassment course, which identifies what behavior constitutes harassment and highlights the employee’s obligation to report harassment.
However, the existence of a sexual harassment policy and training alone does not satisfy the employer’s burden under the first prong of the Ellerth/Faragher defense because the employer not only must take reasonable care to prevent sexually harassing behavior but also to correct promptly any such behavior. See Ellerth, 524 U.S. at 765, 118 S.Ct. 2257; Faragher, 524 U.S. at 807, 118 S.Ct. 2275; see also Hurley v. Atl. City Police Dep’t, 174 F.3d 95, 118 (3d Cir.1999). CDOT’s actions reflected reasonable care to promptly correct Mr. Martinez’s behavior. Mr. Trujillo immediately began his investigation once Ms. Pinkerton submitted her complaint on February 24, 2003. On March 18, 2003, when Ms. Harding learned from the EEO that Ms. Pinkerton’s sexual harassment complaint might be justified, she immediately removed Mr. Martinez as Ms. Pinkerton’s supervisor. Ms. Harding received Mr. Trujillo’s investigation report on March 21, 2003; held an R-6-10 hearing with Mr. Martinez on April 1, 2003; and demoted and reassigned him six days later on April 7, 2003. In other words, CDOT removed Mr. Martinez as supervisor before the investigation was complete and demoted him roughly two weeks after the final investigative report. These facts demonstrate that CDOT acted promptly to resolve the harassment issue.
Ms. Pinkerton, however, argues that CDOT acted unreasonably by failing to remove Mr. Martinez from his supervisory position over her upon her first complaint. In certain circumstances, an employer’s failure to remove a supervisor from close working proximity with a subordinate who has alleged sexual harassment against that supervisor might be seen as unreasonable. But here a number of factors persuade us that no reasonable factfinder could see CDOT as dilatory. The alleged harassment took the form of oral statements (not physical abuse) that ceased — without resuming — after Ms. Pinkerton’s complaint; Ms. Pinkerton herself did not request separation from the supervisor; CDOT promptly launched an investigation; and the matter was conclusively resolved in a matter of weeks. Given CDOT’s quick and effective[5] action on Ms. Pinkerton’s com *1063 plaint, we see no genuine issue left for trial about the reasonableness of CDOT’s response.
b. Second Element of the Ellerth i Faragher Affirmative Defense
Having found that CDOT did carry its burden with regard to the first element of the affirmative defense, we must turn to the question of whether Ms. Pinkerton unreasonably failed to avail herself of the preventive or corrective opportunities afforded her. “Following Ellerth and Faragher, the plaintiff who alleges no tangible employment action has the duty to mitigate harm, but the defendant bears the burden to allege and prove that the plaintiff failed in that regard.” Suders, 542 U.S. at 152, 124 S.Ct. 2342. CDOT argues that Ms. Pinkerton’s failure to report the incidents for two months was unreasonable because she acknowledged having read CDOT’s harassment policy and yet never availed herself of the numerous opportunities to report the incidents at her many meetings with Ms. Miller, Ms. Harding, or Mr. Gabel. We believe that CDOT carried its burden, given that CDOT has shown a reporting delay of approximately two or two and a half months (the harassment began in December but Ms. Pinkerton made no complaint until February 19, 2003) for which Ms. Pinkerton never offered any reason in her briefs on appeal.
The only explanation that finds any support in the record is the one suggested by Mr. Trujillo’s report, namely, Ms. Pinkerton’s expressed “fear that Mr. Martinez would retaliate against her.” However, we note that many of our sister circuits have stated that a generalized fear of retaliation simply is not sufficient to explain a long delay in reporting sexual harassment. See Thornton v. Fed. Express Corp., 530 F.3d 451, 457 (6th Cir.2008) (two month delay); Williams v. Missouri Dep’t of Mental Health, 407 F.3d 972, 976 (8th Cir.2005) (four month delay); Walton v. Johnson & Johnson Svcs., Inc., 347 F.3d 1272, 1277, 1290-91 (11th Cir.2003) (approximately two and a half month delay); Casiano v. AT & T Corp., 213 F.3d 278, 280-81, 287 (5th Cir.2000) (approximately four month delay); see also Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir.2001) (discussing why the generalized fear of retaliation is insufficient); Shaw v. AutoZone, Inc., 180 F.3d 806, 813 (7th Cir.1999) (same). The rationale behind Title VII compels us to agree. The “primary objective” of Title VII “is not to provide redress but to avoid harm.” Faragher, 524 U.S. at 806, 118 S.Ct. 2275. To promote this objective of avoiding harm, Title VII in general, and the Ellerth/ Faragher defense in particular, is premised on a cooperative framework wherein the employee reports sexual harassment and the employer remedies the improper conduct. “[T]he law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes- a concerted effort to inform the employer that a problem exists.” Shaw, 180 F.3d at 813 (internal quotation marks omitted). It is undeniable that raising problems regarding sexual harassment can be uncomfortable for the employee, but if we were to allow an employee’s subjective, ungrounded fears of unpleasantness or retaliation to alleviate an employee’s reporting requirement, we would “completely undermine Title VII’s basic policy ‘of encouraging forethought by employers and saving action by objecting employees.’ ” Barrett, 240 F.3d at 268 (quoting Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Ellerth, 524 U.S. at 764, 118 S.Ct. 2257). This case provides a good example of why we ought to encourage saving action by employees, given that once Ms. Pinkerton did complain, the harassment stopped. Had CDOT been notified earlier, there is a good chance that
*1064 Title VII’s primary goal of preventing harm would have been served.
In this case, the lapse of time was not vitiated by the fact that the events giving rise to the complaint were relatively minor. If that were the situation presented here, then a two or two and a half month delay might be reasonable, because an employee should not necessarily be expected to complain to management immediately after the first or second incident of relatively minor harassment. We will not require plaintiffs to report individual incidents that are revealed to be harassment only in the context of additional, later incidents, and that only in the aggregate come to constitute a pervasively hostile environment. However, far from involving minor incidents, this ease involves inappropriate comments that were perceived by Ms. Pinkerton to be so serious that she felt physically ill upon the first instance. What is more, because it is undisputed that Ms. Pinkerton had received the harassment training and knew that the incidents should have been reported, we find no adequate excuse for her delay there. Nor is Ms. Pinkerton’s delay explained by the fact that she felt she could deal with the situation and compel Mr. Martinez to stop his inappropriate comments without having to appeal to higher authorities; the record on appeal simply does not support such an argument. Accordingly, we must conclude that CDOT has shown that Ms. Pinkerton’s unexplained delay in reporting the harassment was unreasonable.[6]
B. Title VII Retaliation Claim
In addition to prohibiting sexual harassment, Title VII contains an anti-retaliation provision that forbids an employer from discriminating against an individual because that individual “has opposed any practice made an unlawful employment practice” by Title VII or because that individual “has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing” pursuant to Title VII. 42 U.S.C. § 2000e-3(a); see Timmerman, 483 F.3d at 1122. Where the plaintiff seeks to prove a Title VII retaliation claim through indirect or circumstantial evidence, the burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1176 (10th Cir.2007). “To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.” Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1202 (10th Cir.2006); see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-70, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Montes, 497 F.3d at 1176. Once the plaintiff has made out a prima facie case, the employer must “articulate a legitimate, nondiscriminatory reason for the adverse employment action.” Meiners v. Univ. of Kan., 359 F.3d 1222, 1229 (10th Cir.2004). If the employer articulates a legitimate reason for the action, then the plaintiff must demonstrate that the employer’s asserted reasons are pretextual. Id.
In this case, for the purposes of summary judgment, CDOT did not dispute that Ms. Pinkerton could establish a prima facie case of retaliation. In turn, Ms. *1065 Pinkerton does not — nor could she — dispute that CDOT proffered a legitimate reason for her termination, namely, her poor work performance. See Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1172 (10th Cir.2006) (stating that poor job performance is a legitimate, nonretaliatory reason for termination). Therefore, the only question before this court is whether Ms. Pinkerton has shown “that there is a genuine dispute of material fact as to whether [CDOT’s] explanations for terminating her employment are pretextual.” Metzler, 464 F.3d at 1172; Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir.1995).
To establish a genuine issjie as to pretext, Ms. Pinkerton must demonstrate that CDOT’s “proffered non-discriminatory reason is unworthy of belief.” Randle, 69 F.3d at 451. Ms. Pinkerton can meet this standard by producing evidence of “such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.” Argo, 452 F.3d at 1203 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997)) (internal quotation marks omitted). To establish a genuine issue regarding whether CDOT’s proffered reason was pretextual, Ms. Pinkerton points to the temporal proximity between her protected activity and her termination, Ms. Harding’s allegedly weak reasons for firing Ms. Pinkerton, and the attempt to get Ms. Pinkerton a new job. However, this evidence does not show weaknesses, implausibilities, or inconsistencies in CDOT’s proffered reason for Ms. Pinkerton’s termination.
First, Mr. Gabel’s and Ms. Harding’s attempt to get Ms. Pinkerton another job does not support an inference that the poor job evaluations were just a pretext for her termination. The undisputed facts show that a data entry position, the job that Ms. Harding found for Ms. Pinkerton, was much more suited to Ms. Pinkerton’s abilities than her position as an AA II. She had held such a job for ten years prior to becoming an AA I, and the only poor reviews that appear on the record before us involve Ms. Pinkerton’s work as an AA II and AA III. Moreover, the mere fact that Ms. Harding was nice enough to try to help Ms. Pinkerton find another job does not support the inference that she actually believed that Ms. Pinkerton’s performance was adequate and that, ergo, her later justifications were pretextual. To the contrary, finding another position is perfectly compatible with the idea that Ms. Pinkerton’s job performance was inadequate; it is not at all unusual for a department to attempt to transfer an under-performing .employee. As this case demonstrates, doing so is much simpler than firing an employee because one is less likely to get sued. Moreover, it would be counter-productive to use the fact that Ms. Harding was trying to be helpful to Ms. Pinkerton as proof that she was retaliating against her. Accordingly, contrary to Ms. Pinkerton’s argument, the fact that Ms. Harding tried to help Ms. Pinkerton find a job does not point out any inconsistencies or weaknesses in CDOT’s asserted reason for Ms. Pinkerton’s termination.
Second, Ms. Pinkerton ignores the undisputed evidence when she suggests that Ms. Harding’s testimony casts doubt on CDOT’s reason for terminating Ms. Pinkerton’s employment. Ms. Pinkerton seizes upon Ms. Harding’s testimony that Ms. Pinkerton was fired because of “typographical errors” in her work, as demonstrating pretext. Apparently, Ms. Pinkerton is arguing that these errors were not significant enough to warrant termination.
*1066 However, it is uncontroverted that Ms. Pinkerton spent months failing to comply with the objective IPOs established in her settlement agreement with CDOT — some of which limited the number of typographical errors she was permitted to make— and that she wanted CDOT to use in evaluating her. Therefore, Ms. Harding’s comments regarding Ms. Pinkerton’s typographical errors are perfectly consistent with CDOT’s asserted reason for the termination. We are in no position to state that the numerous documented failures by Ms. Pinkerton were not serious enough to justify termination. See Jones v. Barn-hart, 349 F.3d 1260, 1267 (10th Cir.2003) (stating that the court should not “act as a super personnel department that second guesses employers’ business judgments” (internal quotations omitted)).
Given that Ms. Pinkerton’s first two arguments do not support a finding of pretext by highlighting some weakness or inconsistency with CDOT’s explanation, we are left with the temporal proximity argument. Ms. Pinkerton points out that, instead of firing her in October 2002, CDOT fired her on March 27, 2003, about one month after she filed her complaint with Mr. Trujillo and only one week after the complaint was verified. However, this timeline is incomplete; from November 7, 2002, when Ms. Pinkerton knew her job was in peril, until March 3, 2003, when she verified that she would not take the data entry position, CDOT was under the impression that Ms. Pinkerton was going to take another job. It was only as of March 3, 2003, then, that CDOT had any reason to pursue further action against Ms. Pinkerton. This greatly weakens any temporal relation between Ms. Pinkerton’s complaint and her termination. Regardless, temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer’s proffered reason is actually pretext for retaliation.[7] Annett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir.2004); Pastran v. K-Mart Corp., 210 F.3d 1201,1206 (10th Cir.2000).
Certainly, “[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a ‘mini-trial’ to determine the defendant’s true state of mind.” Randle, 69 F.3d at 453. For summary judgment purposes, as “long as the plaintiff has presented evidence of pretext ... upon which a jury could infer discriminatory motive, the case should go to trial.” Id.; see Anderson, 477 U.S. at 249, 106 S.Ct. 2505. However, Ms. Pinkerton did not present such evidence, and therefore has not established a genuine issue for trial on the retaliation claim.
Finally, we note that a recurrent theme in Ms. Pinkerton’s briefs is that her claim of discrimination and retaliation should not depend upon her being a model employee. We agree that Title YII protects all employees from discrimination, notwithstanding the quality of the employee’s job performance. At the same time, an employer is entitled to raise defenses, including that the termination was justified by the employee’s under-performance or, in the case of hostile work environment sexual harassment, that the employee did not promptly take advantages of remedial mechanisms. We have applied the law within this frame *1067 work in reaching the conclusion that Ms. Pinkerton failed to show pretext and a reason for her delay in complaining of sexual harassment.
AFFIRMED.

. Mr. Ellis had rated Ms. Pinkerton’s performance as either "good” or “fully competent” throughout the time he supervised her from 1995 to 2000. However, Mr. Ellis also consistently noted that Ms. Pinkerton struggled with maintaining co-worker relations. In his first few reviews, Mr. Ellis also noted problems with the number of errors committed by Ms. Pinkerton.

. Colorado State Personnel Rule R-6-10 provides for a meeting at which employees are informed of disciplinary charges and given the opportunity to be heard.

. An employer can also be found directly liable for a supervisor’s actionable sexual harassment in certain instances, including when the supervisor engaged in the harass *1059 ment with the purpose of serving the employer or when the supervisor's high rank makes him the employer’s alter ego. See Harrison v. Eddy Potash, Inc., 158 F.3d 1371, 1374-75 (10th Cir.1998). However, Ms. Pinkerton does not argue that CDOT is directly liable for Mr. Martinez's remarks.

. Of course, the Supreme Court has discouraged the categorical use of a "quid pro quo” theory as opposed to a “hostile work environment” theory. Ellerth, 524 U.S. at 753-54, 118 S.Ct. 2257; see Rubidoux v. Colo. Mental Health Inst., 173 F.3d 1291, 1295-96 (10th Cir.1999). We are not using the quid pro quo argument in that manner. Rather, we use the *1060 “quid pro quo” terminology only insofar as it might be useful to show that the harassment culminated in a tangible employment action. Ellerth, 524 U.S. at 753-54, 118 S.Ct. 2257.

. Ms. Pinkerton, relying on Gunnell, argues that the fact the harassment ceased after the complaint does not demonstrate that CDOT acted promptly to remedy the harassment. Aplt. Br. 35. However, Gunnell does not speak to the Ellerth/Faragher affirmative defense and the question of whether the employer took reasonable steps to stop the harassment. Gunnell, 152 F.3d at 1261 (remanding for the district court to examine the claims in light of the then-newly issued Ellerth and Faragher opinions).

. This conclusion is consistent with our unpublished decision in Conatzer. In that case, we found an unexplained delay of three weeks to be unreasonable where the victim knew of her duty to report the harassment (like Ms. Pinkerton). Conatzer, 95 Fed.Appx. at 281.

. Ms. Pinkerton draws our attention to language in Meiners stating that temporal proximity of six weeks "may be sufficient, standing alone, to show causation.” 359 F.3d at 1231. However, as the quoted language itself shows, our discussion in Meiners related to causation for purposes of establishing a prima facie case, and not whether it sufficed to demonstrate pretext at the third prong of the McDonnell-Douglas framework. See Annett, 371 F.3d at 1240 (making the same argument about similar language in Ramirez v. Olda. Dep’t. of Mental Health, 41 F.3d 584, 596 (10th Cir.1994)). We have already distinguished these two different inquiries. Annett, 371 F.3d at 1241.