**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 13, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SA'QUENA LLAMAS,

      Plaintiff - Appellant,

v.

QC FINANCIAL SERVICES, INC.,
d/b/a Quik Cash,

      Defendant - Appellee.

No. 14-3058
(D.C. No. 2:13-CV-02053-JTM)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, **HOLMES**, and **McHUGH**, Circuit Judges.

---

Plaintiff-Appellant Sa'Quena Llamas appeals from the district court's grant

of summary judgment in favor of her former employer Defendant-Appellee QC

Financial Services, Inc. (QC). Llamas v. QC Fin. Servs., Inc., No. 13–2053–JTM,

2014 WL 707231 (D. Kan. Feb. 24, 2014). On appeal, Ms. Llamas contends she

was wrongfully discharged in retaliation for opposing pregnancy discrimination in

violation of Title VII of the Civil Rights Act of 1964 (Title VII) and the

Pregnancy Discrimination Act (PDA). Aplt. Br. 2. She advances a "cat's paw" or

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

"subordinate bias" theory of liability, alleging the regional manager who terminated her employment improperly relied on a biased report from a subordinate manager. Id. at 23. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Background

On May 26, 2009, Ms. Llamas was hired by Deanna Robinson, an Area Manager for QC, to serve as a Customer Service Representative. Ms. Robinson oversees the daily operations of four stores and reports to a Regional Manager, William Banker. QC provided Ms. Llamas with an Employee Manual setting forth QC's policies, procedures, and expectations for employees. It contains a policy against discrimination and harassment, stating that "[e]mployees who believe they have been subjected to or witnessed any unlawful discrimination or harassment should immediately report the matter to their Area Manager, Regional Manager, or the Company's Human Resources Department." Aplt. App. 155–56. The manual also sets forth disciplinary procedures and a sample list of conduct that may result in termination, including "[i]nsubordination to a supervisor," "[l]ack of respect for and cooperation with co-workers, including the use of profane or abusive language," and "[a]ny other activity that the Company reasonably believes represents a threat to the smooth operation, goodwill or profitability of its business." Id. at 153.

The record shows Ms. Llamas received several promotions and pay raises during her time at QC. Ms. Robinson first promoted Ms. Llamas to the position of Assistant Branch Manager on August 26, 2009. With her promotion, her salary increased from $9.00 to $10.25 per hour. A few weeks later, on October 7, 2009, Ms. Llamas informed Ms. Robinson that she was pregnant. The following day, Ms. Robinson promoted Ms. Llamas to the position of Branch Manager. Mr. Banker approved Ms. Llamas' promotion, which increased her salary to $12.00 per hour.

As Branch Manager, Ms. Llamas was the "face of the store" and the highest-ranking official at the store. Id. at 56. Her duties included managing employees, opening the store on time, counting the money in the safe, and maintaining general responsibility for the store. When Ms. Llamas' pregnancy ended in miscarriage in 2009, she missed work due to complications. She was never demoted, and she did not lose any salary or benefits.

In April 2010, Ms. Robinson gave Ms. Llamas another raise to $12.50 per hour, based on a March 2010 performance appraisal. Mr. Banker approved her raise. The March 2010 performance appraisal reflected an overall rating of "[m]eets and sometimes exceeds relevant performance standards." Id. at 130. In the category of "[a]rrives at work each scheduled day, on time, and ready to work at scheduled start time," Ms. Llamas received a rating of "[c]onsistently exceeds relevant performance standards." Id. at 128–29. Her "[a]reas of strong

performance" included "knowledgable [sic] of job duties, displays good customer service, and maintains a team focused work environment," while her "[a]reas of performance needing improvement" included "work on your leadership skills." Id. at 130.

Despite her positive evaluation for the preceding year, Ms. Llamas was tardy on several occasions between March 2010 and December 2010. The parties dispute whether Ms. Robinson formally counseled or took disciplinary action against Ms. Llamas, but they agree that Ms. Robinson spoke with her about her performance issues. Supp. App. 17. Ms. Robinson stated she spoke with Ms. Llamas about these concerns on an almost weekly basis between March and December 2010. Id. at 87. Their regular conversations began before Ms. Llamas was pregnant with the child she delivered on March 1, 2011 and continued during her pregnancy. Ms. Llamas asserts she did not perceive the discussions to be disciplinary in nature, and it was her "understanding that [she] was supposed to work closely with Ms. Robinson to resolve issues." Aplt. App. 213.

According to Ms. Robinson and Mr. Banker, on January 4, 2011, they formally counseled Ms. Llamas about her job performance issues. Supp. App. 45–46, 61–62. Specifically, they discussed her tardiness, lack of professionalism, and habit of bringing personal issues into the workplace. Mr. Banker participated by phone and reiterated to Ms. Llamas that the problems they were addressing had been discussed previously, and she needed to improve her behavior. This meeting

was disciplinary in nature, and Ms. Llamas was given an opportunity to make the necessary corrections to her job performance.

In her declaration, Ms. Llamas characterizes the events of January 4 differently. She asserts she had an argument with Ms. Robinson about writing off a customer's debt, and Ms. Robinson told her she was "acting rude." Aplt. App. 213–14. Ms. Llamas then called Mr. Banker, who said he had spoken with Ms. Robinson about her behavior. He instructed her to "work with [Ms. Robinson] to resolve [their] differences." Id. at 214. Ms. Llamas contends neither Ms. Robinson nor Mr. Banker commented on her tardiness or habit of discussing personal issues at work, and they did not indicate that their conversations were disciplinary.[1] Id. The record shows that, later the same day, Ms. Llamas sent Ms. Robinson a message on Facebook saying she was "really excited to get off to a great new start!" Ms. Robinson responded by saying "Me too! We're going to have [a] great year!" Supp. App. 92.

For the next month, Ms. Robinson testified Ms. Llamas continued to have

---

[1] Before the district court, QC moved to strike large portions of Ms. Llamas' declaration, arguing it directly contradicted her previous deposition testimony. The court denied the motion to strike because "such motions are not appropriately advanced in the context of summary judgment motions and their support pleadings." Llamas, 2014 WL 707231, at *2. The court noted, however, that the portions of Ms. Llamas' declaration regarding the January 4 meeting indeed conflicted with her previous testimony, in which she stated that Mr. Banker and Ms. Robinson "counseled" her about "punctuality and about professionalism and teamwork." Id. at *3. In any event, the district court emphasized that the contradictions had no effect on its ultimate conclusion. Id.

performance issues, including tardiness and lack of professionalism. Ms. Robinson stated that, on one occasion, Ms. Llamas did not come to work; after texting to say she would be staying home, she did not respond to Ms. Robinson's questions. Id. at 48.

On February 8, 2011, Ms. Llamas notified QC of her need to take medical leave for the birth of her child, beginning March 1, 2011. Ms. Robinson assisted Ms. Llamas in securing FMLA leave. Ms. Llamas returned to work on April 12, 2011, with no medical restrictions.

On April 14, 2011, Ms. Llamas failed to open the store on time. She did not arrive until almost 10 a.m. A few days later, on April 20, Ms. Llamas received a counseling form signed by Ms. Robinson. Aplt. App. 133. The form instructed her to "[t]ake proper action to ensure that you arrive at work on time." Id. "Next occurrence will lead to disciplinary action up to and including termination." Id.

On April 22, 2011, Ms. Llamas received her annual performance assessment from Ms. Robinson, covering the period from March 2010 to April 2011. She received the lowest possible overall rating of "[s]ometimes falls short of expected job performance and goals." Id. at 136. The form noted that, prior to Ms. Llamas' maternity leave, her "overall performance has lacked compared to last year's performance review." Id. at 135. Ms. Llamas "[n]eed[s] to develop and maintain a professional, team oriented work environment." Id. The

assessment stresses "the importance of arriving at work on time and being ready to work at scheduled time. . . . [I]f the key holder is late that is a poor reflection of our business, inconvenience to customers or loss of revenue and coworkers that have to wait and loose [sic] work time." Id. It further advises Ms. Llamas: "Since returning to work you must maintain an acceptable level of performance or disciplinary action up to and including termination will occur." Id. Based on this performance review, Ms. Llamas received only a modest pay raise from $12.50 to $12.75 per hour.

Ms. Llamas asserts that, during the meeting in which she received her review, she told Ms. Robinson she "felt like the assessment was unfairly based on [her] pregnancy." Id. at 215. However, she concedes she did not always perform according to expectations. Supp. App. 17. She was given an opportunity to comment on her performance review, but did not. Id. at 29. She agrees she had "every opportunity" to complain directly to Mr. Banker about her review, and to raise any potential concerns about pregnancy discrimination to him, but she did not. Id.

Over the course of April and May 2011, QC asserts there were several additional complaints about Ms. Llamas' conduct and behavior. According to Ms. Robinson, a subordinate hired during Ms. Llamas' maternity leave, Brenda Prevost, told Ms. Robinson that she felt disrespected by Ms. Llamas and that the work environment in the store was unprofessional. Id. at 89. Ms. Prevost

- 7 -

documented her concerns in an email she sent to Ms. Robinson on May 24, 2011. According to Ms. Prevost, Ms. Llamas told her "I was not going to hire you," "[Ms. Robinson] went behind my back while I was gone on leave and hired you," and "if I don't like you I can fire you, but that's not me." Id. at 95. Ms. Prevost expressed a number of other concerns about Ms. Llamas' conduct, including that she dressed unprofessionally, told customers about her personal life, and did "scratch offs in the back" of the store. Id. Ms. Llamas was aware that Ms. Prevost felt disrespected by her behavior. Id. at 25.

On May 13, 2011, Ms. Llamas left the store without permission to attend a yard sale. On her way back to work, she picked up a stray dog and brought it to the store. Ms. Llamas concedes this was against QC's rules. Id. at 17. A few days later, on May 19, Ms. Llamas opened the store wearing sleepwear, which is also against QC's rules. Id. at 24.

On May 17, 2011, Mary Youngblood, a corporate internal auditor, conducted a routine audit of Ms. Llamas' store. Prior to the audit, Ms. Youngblood had never met Ms. Llamas. According to Ms. Youngblood, Ms. Llamas inappropriately berated Ms. Prevost several times during the audit. Aplt. App. 143. Ms. Youngblood stated she witnessed a number of other violations of company policy by Ms. Llamas. For example, she saw Ms. Llamas speak negatively about a customer in front of another customer. Supp. App. 102. Also, Ms. Llamas cursed fairly often. Ms. Llamas admits she used profane language,

although she denies other elements of Ms. Youngblood's report.  Id. at 36.  The overall audit score was 70.80, which Ms. Llamas agreed was "not a very good score at all."  Id. at 31.

The day following the audit, Ms. Youngblood contacted QC's Human Resources department to report what she observed.  In the hundreds of audits Ms. Youngblood has conducted during her time at QC, this was the only time she felt the need to contact Human Resources.

On the same day, Ms. Llamas also contacted Human Resources to inquire about how she could add a comment to her performance assessment documenting her concern that it was unfairly based on her pregnancy.  Upon advice, she sent an email to Ms. Robinson stating, "I was just thinking I should of [sic] made a comment on my year review . . . about it not being fair that my review was based off the last couple of months of my pregnancy and not the year as a whole."  Aplt. App. 145.

According to Mr. Banker, on May 24, 2011, the Human Resources director, Annette Glary, contacted him to discuss Ms. Youngblood's report of Ms. Llamas' "abhorrent" behavior during the audit.  Id. at 125.  Ms. Glary informed Mr. Banker that Ms. Llamas was "highly unprofessional."  Id.  Mr. Banker then spoke directly with Ms. Youngblood, who reiterated that Ms. Llamas had been "unprofessional, rude, [and] disrespectful."  Id.  She had used "foul language" in front of customers and employees, and she behaved disrespectfully to a

subordinate. Id. Mr. Banker instructed Ms. Robinson to set up a meeting with Ms. Llamas.

Ms. Robinson and Ms. Llamas had two phone conversations on May 24. First, Ms. Robinson called Ms. Llamas to report that Mr. Banker wanted to meet the next day. After their first phone conversation, Ms. Llamas faxed a comment she had prepared to Ms. Robinson regarding her performance assessment. The comment stated:

> I _____ do not feel that my review was based on the year as a whole. I feel that toward the end of my pregnancy I did not do my best due to how I felt. However I do not believe that being pregnant is an excuse not to perform to the duties of my job title. I was under the impression that everyone was understanding about my situation until my review. At the time my review was presented to me I did not but should have made the comment on the form. I am doing so now just to have documentation that I did verbally comment.

Id. at 147.

According to Ms. Robinson, Ms. Llamas used rude and profane language during their second phone conversation, saying "if we were going to fire her, then she would like to know right then and there because she wasn't going to bust her ass for us." Id. at 121. Ms. Llamas disputes the content of the second conversation. According to a transcript of the call Ms. Llamas submitted to the district court, Ms. Llamas and Ms. Robinson again discussed her performance assessment. Ms. Llamas stated: "I felt like I did just as good except for like you know the last couple months of my pregnancy I don't feel like, you know, I did as

much as normal." Id. at 219. Ms. Robinson responded: "You say it in the thing you sent to me, yourself . . . [t]hat the pregnancy was not an excuse for not performing your job duties." Id. at 220.

After their second phone conversation, Ms. Robinson spoke again with Mr. Banker. According to Mr. Banker, Ms. Robinson told him Ms. Llamas had again been rude, unprofessional, insubordinate, and disrespectful. He testified, "[a]t that point, weighing—weighing what had happened previous with the auditor days before . . . I made the decision. And I told [Ms. Robinson], and I said we're not having a meeting, you terminate her." Id. at 126.

The next day, May 25, 2011, Ms. Llamas was discharged for, among other things, improper conduct, unprofessional behavior during the audit, making derogatory remarks, being disrespectful toward a subordinate, failing to maintain a professional work environment, cursing in front of customers, being insubordinate, and continued poor performance.

Discussion

We review a grant of summary judgment de novo, applying the same legal standard as the district court. Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1145 (10th Cir. 2008). Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact

is "material" only if it might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The moving party bears the burden of showing that no genuine dispute of material fact exists. Adler v. Wal–Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).

At the summary judgment stage, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1058 (10th Cir. 2009). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Title VII makes it an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). The PDA amended Title VII to state specifically:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for

- 12 -

all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ."

Id. § 2000e(k).  Further, Title VII prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful employment practice by this subchapter."  Id. § 2000e-3(a).

To establish a retaliation claim, a plaintiff may either offer direct evidence that retaliation played a motivating part in an adverse employment decision, or she may rely on circumstantial evidence under the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 998 (10th Cir. 2011).  Under McDonnell Douglas, a plaintiff must first state a prima facie case of retaliation by showing: "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."  Khalik v. United Air Lines, 671 F.3d 1188, 1193 (10th Cir. 2012) (internal quotation marks omitted).  Once the plaintiff has stated her prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  Id. at 1192.  If the defendant is successful, a plaintiff must show either that her protected status was a determinative factor in the defendant's employment decision or that the defendant's explanation is pretext.  Id.

- 13 -

QC argues Ms. Llamas failed to establish a prima facie case of retaliation in violation of Title VII. It is undisputed that Ms. Llamas suffered a materially adverse employment action when she was terminated. However, QC contends she did not engage in any protected opposition to discrimination; under the uncontroverted facts construed in Ms. Llamas' favor, she neither complained about pregnancy discrimination nor conveyed a belief that QC had engaged in any practice made unlawful by Title VII or the PDA. Aplee. Br. 21–28. Neither her various statements that she believed her performance assessment was unfairly based on her pregnancy nor her May 24 fax "would alert an ordinary reader to suppose that Llamas was complaining of discrimination." Llamas, 2014 WL 707231, at *18. QC argues Ms. Llamas repeatedly admitted she performed poorly during her pregnancy and agreed pregnancy is no excuse for poor performance. Thus, in essence, her assertion that her performance review unfairly focused on her substandard performance during pregnancy was a request for leniency—not a valid complaint of discrimination protected under Title VII.

QC also argues Ms. Llamas failed to establish the third element of her prima facie case, that a causal connection existed between any alleged protected activity and her termination. To demonstrate the requisite causation, Ms. Llamas relies on a close temporal proximity between her complaints on April 22, May 18, and May 24, and her termination on May 25. QC argues that, although we have previously held that a protected activity closely followed by an adverse action

- 14 -

may give rise to an inference of discriminatory motive, <u>Marx v. Schnuck Mkts.,</u> <u>Inc.</u>, 76 F.3d 324, 329 (10th Cir. 1996), the facts here do not support such an inference, Aplee. Br. 30.

Yet, we need not decide whether Ms. Llamas has satisfied the requirements of a prima facie case of retaliation. QC has articulated legitimate nondiscriminatory reasons for Ms. Llamas' termination, and Ms. Llamas has failed to show these reasons were mere pretext for pregnancy discrimination.

Ms. Llamas concedes QC has met its burden to show a legitimate business rationale for her termination: Mr. Banker was unaware that Ms. Llamas allegedly engaged in any protected activity, and he terminated her for being rude, unprofessional, insubordinate, and disrespectful. Because nothing in the record suggests Mr. Banker acted with discriminatory intent, Ms. Llamas must rely upon a claim of "cat's paw" or "subordinate bias" liability. Aplt. Br. 21. "Cat's paw" liability is appropriate when "a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." <u>E.E.O.C. v. BCI Coca-Cola Bottling Co. of</u> <u>L.A.</u>, 450 F.3d 476, 484 (10th Cir. 2006). The Supreme Court recently elaborated on this theory of liability. <u>Staub v. Proctor Hosp.</u>, 562 U.S. 411, 413 (2011). Based on common law principles of agency and tort law, "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate

cause of the ultimate employment action, then the employer is liable." Id. at 422 (footnote omitted).

On summary judgment, a plaintiff advancing a "cat's paw" theory of liability must show: (1) a genuine issue of material fact concerning the bias of the subordinate, and (2) a genuine issue of material fact concerning a causal relationship between the biased subordinate's actions and the adverse employment action. BCI, 450 F.3d at 488. We have emphasized that, in order to demonstrate the requisite causal relationship, a "plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process." Id. at 487.

Here, Ms. Llamas has failed to demonstrate a genuine issue of material fact concerning any alleged discriminatory animus held by Ms. Robinson. Ms. Llamas' only proffered evidence of Ms. Robinson's bias is the allegedly false report she gave to Mr. Banker about Ms. Llamas' profane language and disrespectful attitude during their second phone conversation on May 24. Aplt. Br. 28. Ms. Llamas contends that a false report is sufficient to establish wrongful animus in the employment context. Id. (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)). She cites a passage in Reeves stating, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." 530 U.S. at 147. These are not such appropriate circumstances.

- 16 -

Since the parties dispute the accuracy of Ms. Robinson's report about the language and tone of the second phone conversation, for purposes of summary judgment we will assume Ms. Robinson's report to Mr. Banker was inaccurate. But this simply is not enough to satisfy Ms. Robinson's burden to identify falsity that could plausibly suggest discriminatory animus. Ms. Robinson had any number of nondiscriminatory reasons to complain, exaggerate, or potentially lie to her supervisor—most apparently, her clear frustration with Ms. Llamas' chronic misbehavior. Ms. Llamas was repeatedly tardy and failed to open the store on time, she left work during store hours without permission and returned with a stray dog, she opened the store wearing sleepwear, she behaved disrespectfully toward her subordinate, and she conducted herself so inappropriately during an internal audit that the auditor took the unusual step of reporting her behavior to Human Resources. Ms. Llamas does not contest that each of these incidents occurred, that they violated QC's policies or objectives, or that they were concerning to Ms. Robinson. Further, she admits she had regular conversations regarding her performance with Ms. Robinson. She generally concedes she did not perform her job to the best of her ability or in accordance with QC's expectations during the period encompassed by her negative assessment.

At the same time, and also undercutting any inference of animus, the record shows Ms. Robinson gave Ms. Llamas four pay raises during her time at QC—once while she was pregnant, once after she had a miscarriage, and once

after she returned from FMLA leave. She gave Ms. Llamas time off when she had a miscarriage in 2009, and she helped Ms. Llamas obtain FMLA leave during her pregnancy in 2011. Under these facts, a reasonable jury simply could not find that a single inaccurate report—describing behavior wholly consistent with a series of prior uncontroverted incidents—is sufficient to show that Ms. Robinson harbored discriminatory animus toward Ms. Llamas.

Thus, Ms. Llamas' subordinate bias theory necessarily fails, and we need not proceed to examine whether Ms. Llamas has shown a genuine issue of material fact concerning a causal relationship between the false report and her termination.

AFFIRMED.


Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge