**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 5, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LOUISE M. DUVALL,

        Plaintiff - Appellant,

v.

THE PUTNAM CITY SCHOOL
DISTRICT, INDEPENDENT
SCHOOL DISTRICT NO. 1 OF
OKLAHOMA COUNTY; LEE
ROLAND; MARJORIE IVEN,

        Defendants - Appellees.

No. 11-6250
(D.C. No. 5:09-CV-01362-HE)
(W.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY** and **HOLMES**, Circuit Judges, and **MARTINEZ**, District Judge.[**]

        Plaintiff-Appellant Louise M. Duvall appeals from the district court's entry

of summary judgment in favor of Defendants-Appellees Putnam City Independent

School District No. 1 (the "District"), and Ms. Duvall's former supervisors,

Principal Lee Roland and Assistant Principal Marjorie Iven (collectively,

---

[*]     This order and judgment is not binding precedent except under the doctrines
of law of the case, res judicata and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth
Circuit Rule 32.1.

[**]     The Honorable William J. Martinez, United States District Judge for the
District of Colorado, sitting by designation.

"Defendants"). Ms. Duvall brought claims against Defendants asserting, *inter alia*, that Defendants' adverse employment actions violated her rights under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the First Amendment. Defendants moved for summary judgment on all claims and the district court granted their motion.

Ms. Duvall asserts two issues on appeal. First, she contends that "Defendants retaliated against her in violation of § 504 of the Rehabilitation Act." Aplt. Supp. Opening Br. at 21. Second, she claims that "Defendants retaliated against [her] for exercising her clearly-established First Amendment rights." *Id.* at 27 (capitalization altered). For the reasons set forth below, we affirm.[1]

---

[1] Before the district court, and initially before this court, Ms. Duvall proceeded pro se. Subsequently, we appointed counsel to represent her on appeal and allowed counsel to file a supplemental brief. We pause to thank counsel for his able representation of Ms. Duvall, which aided the court in resolving this appeal.

In light of her initial pro se status, the district court compiled a record and transmitted it to us pursuant to Tenth Circuit Rule 11.2(A). As authorized by the appointment order, Ms. Duvall's counsel moved our court to supplement the record. The Defendants only opposed a portion of this motion. That portion related to certain trial exhibits that Ms. Duvall allegedly sought to file with the district court but was unsuccessful—reportedly, for logistical or technical reasons—in doing so; the unopposed portion of the motion related to documents that were properly filed in the district court. Under its authority pursuant to Tenth Circuit Rule 27.3(A)(3), the clerk granted the unopposed portion of Ms. Duvall's motion and left the remainder for resolution by the merits panel. We decline to grant the balance of the motion that relates to documents that were not properly filed in the district court. *See, e.g.*, *United States v. Balderama-Iribe*, 490 F.3d 1199, 1202 n.4 (10th Cir. 2007) ("Because the letter was not submitted to the district court, . . . the appellate rules ordinarily do not permit us to include it now in the record on appeal."). In other words, we **deny** the remainder of the motion. Although Ms. Duvall was proceeding pro se before the district court, if she deemed those documents to

2

# I

Ms. Duvall worked as a special education teacher at Tulakes Elementary School ("Tulakes") for many years. Ms. Duvall's job duties included preparing Individual Education Plans ("IEPs") for children with disabilities, conducting IEP meetings, ensuring compliance with state and federal laws, and documenting disagreements with IEPs. During the 2007–2008 school year, Ms. Iven was the assistant principal at Tulakes and was Ms. Duvall's direct supervisor. Mr. Roland, the principal of Tulakes since August 2004, supervised both Ms. Iven and Ms. Duvall.

Traditionally, the District pulled students with learning disabilities out of

---

be relevant to her case, it was her obligation to ensure that they were properly filed. *See, e.g.*, *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1310 (10th Cir. 2010) (noting that "while pro se litigants are entitled to a liberal reading of their filings, they still must follow the established procedures" (citation omitted)); *see also United States v. Ceballos-Martinez*, 387 F.3d 1140, 1145 (10th Cir. 2004) (noting that "even pro se litigants" do not have "*carte blanche* to disregard congressionally established procedural rules"). Indeed, she managed to accomplish this task as it relates to her other papers before the district court. Furthermore, Ms. Duvall has not made a cogent argument for why these supplemental documents are necessary to our resolution of this appeal. For example, she focuses almost exclusively in her motion on the presence in these documents of a few pages of "exemplars of [her] dissents" to the Individual Education Plans. Aplt.'s Mot. to Supplement at 7 (filed July 2, 2012). However, as noted *infra*, Defendants have not disputed that Ms. Duvall engaged in protected activity—which presumably the contents of her dissents would validate—and Ms. Duvall fails to explain what additional light these documents would shed on the matters contested here. In short, "we conclude the circumstances in the present case do not lead us to believe the interests of justice would best be served by exercising our inherent equitable power to allow [Ms. Duvall] to [further] supplement the record on appeal." *United States v. Kennedy*, 225 F.3d 1187, 1193 (10th Cir. 2000).

ordinary classrooms that included students without learning disabilities of like ages and placed them in separate special education classrooms. However, leading up to the 2007–2008 school year, the District began moving toward a "full inclusion" model for providing special education services. The full inclusion model sought to integrate special education students into regular classrooms, in part, by having special education teachers co-teach special education students in regular classrooms with age appropriate peers.

Prior to the 2007–2008 school year, Ms. Duvall had spent half a day in classrooms working with flex groups[2] and half a day providing pull-out services[3] in her own classroom. However, as part of Tulakes's transition to the full inclusion model, Ms. Iven asked Ms. Duvall to work as a reading interventionist with multiple flex groups, which included both special and regular education students.

At this time, Ms. Duvall sought guidance from her superiors due to her concerns about ensuring compliance with federal laws and regulations regarding the provision of special education services to her students. Ms. Duvall was particularly concerned that removing pull-out services might violate the rights of

---

[2]    A flex group is a small group of children needing help with a particular skill.

[3]    Pull-out services are provided by special education teachers to special education students by removing them from their regular education classrooms and bringing them to special education classrooms for one-on-one or small group instruction.

4

her special education students. Ms. Duvall sent several e-mails to her superiors and also met with Glen Kastner, the Executive Director of Special Services for the District, on several occasions to discuss her concerns.

On October 3, 2007, Ms. Duvall wrote to Mr. Kastner requesting assurance that her compliance with the full inclusion model would not be breaking any state or federal guidelines. Mr. Kastner responded to Ms. Duvall's request with a four-page letter dated October 11, 2007. In his letter, Mr. Kastner explained his views of the legality of the District's actions and assured Ms. Duvall that no federal laws or regulations were being violated. Mr. Kastner also assured Ms. Duvall that "[a]s long as [she] perform[ed her] duties in good faith within the scope of [her] assignment . . . [she had] no reason to be concerned [about liability]." R. at 472 (Letter from Mr. Kastner to Ms. Duvall, dated Oct. 11, 2007). Mr. Kastner noted that "[i]f the District is found to be in non-compliance, the administration will be held responsible," not Ms. Duvall. *Id.*

In addition to voicing her concerns to administrators, Ms. Duvall submitted letters of dissent relating to most of the IEPs with which she was involved during the 2007–2008 school year, and went to state agencies seeking information about "services for children." *Id.* at 460 (Dep. of Louise Duvall, taken Jan. 12, 2011). During her deposition testimony, Ms. Duvall agreed that she did not specifically tell "Ms. Iven, Mr. Roland or other administrators at the district . . . about [her] seeking information from those agencies," but stated that she "certainly was very

5

open about [her] concerns."[4]  *Id.*

On October 25, 2007, Ms. Iven wrote a Letter of Admonishment to Ms.

Duvall.  The letter stated as follows:

> Thursday morning, October 11, 2007, an unfortunate incident occurred during an IEP.  You presented the IEP in a manner that was disconcerting to the parents and team members.  A letter of complaint was received the following day regarding the outcome of the proceedings.
>
> The individual felt blind-sided and uninformed as to the content of the IEP, the lack of support offered, and the surprise at the need for the letter of dissension.  The individual felt the meeting was misrepresentative and unprofessional[.]
>
> For all members of the IEP team, every effort needs to be made to deliver a positive, congruent plan.  It is imperative that you are professional and a team player.  Surreptitious behavior must cease.
>
> Your failure to comply may result in a recommendation for termination or non-renewal of your contract.

*Id.* at 550 (Letter of Admonishment, dated Oct. 25, 2007).  The District claims

that this letter was written to Ms. Duvall "because of the manner in which she had

conducted one specific IEP meeting and presented her Letter of Dissent," and that

the admonishment "was not given as a result of, or in retaliation for, [Ms. Duvall]

---

[4]    There is at least one letter in the record that indicates Ms. Duvall did notify Ms. Iven that she had "consulted with State Department of Education Personnel" regarding letters of dissent, R. at 1108 (Letter from Louise Duvall to Marjorie Iven, dated Nov. 2, 2007); however, as discussed *infra*, there is no evidence concerning the content of Ms. Duvall's communications with the State Department of Education Personnel and no evidence to support the contention that Defendants were aware of the content of Ms. Duvall's communications.

presenting her Letters of Dissent generally, which she had been given permission to do."[5] *Id.* at 402–03 (Def. District's Mot. for Summ. J. & Br. in Supp., filed June 15, 2011); *see also id.* at 482–83 (Aff. of Marjorie Iven, dated June 15, 2011). Ms. Duvall admitted during her deposition that the reason for the admonishment was that she "presented information at an IEP that supposedly offended the classroom teacher that was there." *Id.* at 452.

In early February 2008, Ms. Duvall requested from Ms. Iven a transfer form. At that time, Ms. Iven asked Ms. Duvall to wait until she could look at the schedule. Ms. Duvall did not hear back from Ms. Iven or Mr. Roland until April 28, 2008, when Mr. Roland "offered [Ms. Duvall her] choice between two regular education positions" for the following year. *Id.* at 1113 (E-mail from Louise Duvall to Glen Kastner, dated Apr. 29, 2008). "In the 2007–2008 school year, the last day a teacher could resign without having the possibility of her credentials held for up to one year was April 25, 2008." *Id.* at 863 (Aff. of Louise Duvall, dated July 5, 2011). In response to Mr. Roland's offer, Ms. Duvall informed him that she did not want to lose the extra five percent that she made as a special education teacher.[6] Ms. Duvall explained all of this in an e-mail to Mr. Kastner

---

[5] Mr. Roland and Ms. Iven both submitted affidavits stating that they gave Ms. Duvall permission to submit letters of dissent if she felt they were appropriate. Ms. Duvall also testified at her deposition that Ms. Iven indicated to her that she could continue to submit letters of dissent to the IEPs.

[6] During material times, special education teachers' salaries were five percent
(continued...)

7

on April 29, 2008. In this e-mail she also stated: "This appears to be a good time to submit my transfer request." *Id.* at 1113.

On May 21, 2008, Mr. Roland informed Ms. Duvall, via e-mail, that she was being assigned "to [f]irst grade for the 2008–2009 school year." *Id.* at 1114 (E-mail from Lee Roland to Louise Duvall, dated May 21, 2008). According to Mr. Roland, "It was evident that [Ms.] Duvall did not agree with [the] District's transition to a more inclusive model of serving special education students and that she was discontented in her current position as a special education teacher." *Id.* at 475 (Aff. of Lee Roland, dated June 15, 2011). Further, Mr. Roland stated that he "believed that [Ms.] Duvall was unhappy in her current position as a special education teacher" and that "she would be happier and more comfortable in" first grade. *Id.*

On April 16, 2009, Ms. Duvall filed a formal grievance stating that she felt "as though [she] ha[d] been treated differently from other faculty members." *Id.* at 1045 (Formal Grievance Presentation, dated Apr. 16, 2009). On April 22, 2009, Ms. Duvall submitted her resignation to Dr. April Grace, the executive director of human resources.

Ms. Duvall commenced this lawsuit, in Oklahoma state court, shortly after submitting her resignation in April 2009. Defendants removed the case to federal

[6](...continued)
higher than the salaries of regular education teachers.

8

court in December 2009.  On June 15, 2011, Defendants filed motions for summary judgment on all of Ms. Duvall's claims.  The district court granted these motions as to all claims and all defendants in a single twenty-nine page order.  Ms. Duvall now appeals the district court's grant of summary judgment in favor of Defendants on her retaliation claims under the Rehabilitation Act and the First Amendment.

## II

"We review a district court's grant of summary judgment de novo, applying the same standard as the district court." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011).  More specifically, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "We view the summary judgment evidence in the light most favorable to the non-movant, applying the same standard as the district court." *Bertsch v. Overstock.com*, 684 F.3d 1023, 1027 (10th Cir. 2012).

"With respect to [Ms. Duvall's] § 504 claim [under the Rehabilitation Act], we review the establishment of a prima facie case of retaliation de novo." *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1131 (10th Cir. 2010).  With regard to Ms. Duvall's First Amendment claim, "we have an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field

9

of free expression." *Id.* (quoting *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1276 (10th Cir. 2007)) (internal quotation marks omitted).

## A

We turn first to Ms. Duvall's claim that the district court erred in granting summary judgment in favor of Defendants on Ms. Duvall's claim under § 504 of the Rehabilitation Act.

"In the absence of direct evidence [of retaliation], [Ms. Duvall] may rely upon the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)." *Reinhardt*, 595 F.3d at 1131. Under this framework, Ms. Duvall establishes a prima facie claim of retaliation under the Rehabilitation Act by showing: "(1) that she engaged in protected activity; (2) that she suffered a materially adverse action by [Defendants] either after or contemporaneous with her protected activity; and (3) a causal connection between the protected activity and the adverse action." *Id.* If Ms. Duvall establishes such a case, the burden shifts to Defendants to "produce evidence of a legitimate, nonretaliatory reason for the adverse action." *Id.* If Defendants do so, "the burden of production shifts back to [Ms. Duvall] to show that the proffered reason is pretextual." *Id.*

In its filings before the district court, the District "concede[d] for purposes of its motion for summary judgment that [Ms. Duvall] engaged in protected activity," *see* R. at 1475 (Order, dated Aug. 24, 2011), and Defendants do not

10

argue otherwise on appeal. Thus, we conclude that the first prong of *McDonnell Douglas* is met. We turn then to the second and third prongs of the test—whether Ms. Duvall suffered a materially adverse action by Defendants and whether there was a casual connection between the adverse action and Ms. Duvall's protected activity.

To establish an adverse action, Ms. Duvall must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Reinhardt*, 595 F.3d at 1133 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)) (internal quotation marks omitted). Here, Ms. Duvall points to two actions that she argues were materially adverse: (1) the letter of admonishment she received from Ms. Iven on October 25, 2007; and (2) her reassignment to first grade by Mr. Roland. We address each of these actions in turn.

With regard to Ms. Iven's letter of admonishment, the district court concluded that "the letter of admonishment . . . [did] not constitute adverse action . . . [because Ms. Duvall] admitted that she was admonished because of the inappropriate manner in which she presented a letter of dissent[,] [and] [t]he admonishment did not affect her employment or alter her workplace conditions." R. at 1475 n.26. Generally speaking, we agree with the district court. We

11

conclude that the letter of admonishment did not constitute an adverse action because the letter did not affect Ms. Duvall's work conditions or materially affect her employment. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011) (noting that even though the term "adverse employment action is not necessarily limited" to acts "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits[,] . . . a plaintiff must [always] show that the alleged adverse action caused more than *de minimis* harm to or a *de minimis* impact upon an employee's job opportunities or status" (citations omitted) (internal quotation marks omitted)); *Reinhardt*, 595 F.3d at 1133 ("Acts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions, although a mere inconvenience or an alteration of job responsibilities will not suffice." (quoting *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004)) (internal quotation marks omitted)).  Moreover, it is clear that the letter of admonishment was triggered by the *manner* in which Ms. Duvall conducted her advocacy as opposed to the *content* of her advocacy activity.

Accordingly, we conclude that sending Ms. Duvall the letter of admonishment did not constitute an adverse action.  Because Ms. Duvall has not identified any other allegedly adverse actions that are attributable to Ms. Iven, we

12

conclude that Ms. Duvall has failed to make out a prima facie claim of retaliation under the Rehabilitation Act as to Ms. Iven. The district court therefore properly granted summary judgment in favor of Ms. Iven on Ms. Duvall's claim of retaliation under the Rehabilitation Act.

With regard to Ms. Duvall's reassignment to first grade, the district court concluded that "the reassignment of [Ms. Duvall] to a lower paid position [was] sufficient to make the necessary showing of adverse action." R. at 1475. Again, we agree with the district court. Specifically, we conclude that Mr. Roland's transfer of Ms. Duvall to a lower paid position constituted an adverse action because it resulted in a monetary loss—a five percent decrease in Ms. Duvall's salary.

We turn then to the third prong of *McDonnell Douglas*—whether Ms. Duvall has "establish[ed] a causal connection" between her advocacy on behalf of her special education students and her reassignment to first grade. *Reinhardt*, 595 F.3d at 1134. "Causal connection may be established by producing 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *Id.* (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006), *abrogated in part by Burlington N.*, 548 U.S. at 68, *on other grounds as recognized in Bertsch*, 684 F.3d at 1029).

Most of Ms. Duvall's communications with her superiors concerning Tulakes's special education program took place in October and November 2007. Ms. Duvall's reassignment occurred approximately six months later in April 2008. However, as noted by the district court, Ms. Duvall "continued throughout the 2007–08 school year to voice her concerns about the District's change in method of providing special education services through her letters of dissent to various IEP's." R. at 1476. Accordingly, we conclude that Ms. Duvall's reassignment was "relatively close in time to at least some of [her] dissenting letters or similar objections." *Id.* Ms. Duvall has therefore established a sufficient causal connection between her protected activity and her reassignment to make out a prima facie case of retaliation under the Rehabilitation Act as to Mr. Roland and the District.

Because Ms. Duvall has established a prima facie claim of retaliation under the Rehabilitation Act as to Mr. Roland and the District, the burden shifts to Mr. Roland and the District to "produce evidence of a legitimate, nonretaliatory reason for [Ms. Duvall's reassignment]." *Reinhardt*, 595 F.3d at 1131. Here, the District and Mr. Roland produced evidence that Mr. Roland reassigned Ms. Duvall for a legitimate reason—"because [he] believed she would be happier and more comfortable in [a first grade] position and that such a move would greatly benefit her, her students, and the school." R. at 475. We agree with the district

14

court that this justification for reassigning Ms. Duvall was sufficient to meet the "exceedingly light burden under *McDonnell Douglas* and shift the burden back to [Ms. Duvall] to show that [Mr. Roland's and the District's] proffered justification was merely a pretext." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1165–66 (10th Cir. 2007) (en banc) (citation omitted) (internal quotation marks omitted); *see also Reinhardt*, 595 F.3d at 1131.

"To establish a genuine issue of material fact as to pretext, [Ms. Duvall] must demonstrate that [Mr. Roland's and the District's] 'proffered non-discriminatory reason is unworthy of belief.'" *Reinhardt*, 595 F.3d at 1134 (quoting *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009)). Ms. Duvall "can meet this standard by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Pinkerton*, 563 F.3d at 1065) (internal quotation marks omitted). "[T]he pertinent question in determining pretext is not whether the employer was right . . . but whether [the employer's] belief was genuine or pretextual." *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000) (first alteration in original) (quoting *Hardy v. S.F. Phosphates, L.C.*, 185 F.3d 1076, 1080 (10th Cir. 1999))

15

(internal quotation marks omitted); *see Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) ("We are mindful that in evaluating pretext, the 'relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.'" (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds as recognized in Boyer v. Cordant Tech., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003))).

The district court found that Ms. Duvall had not "produced evidence showing that the District's proffered reasons for its decision to reassign her were pretextual." R. at 1476. On the other hand, Ms. Duvall argues that the explanation "that Mr. Roland believed she would be 'happier' in first grade . . . is implausible and unworthy of belief." Aplt. Supp. Opening Br. at 24. However, Ms. Duvall's argument is undercut by her own evidence and testimony. Ms. Duvall made it clear that she was unhappy with her assignment in the 2007–2008 school year, and she even testified that "[Mr. Roland] probably in his mind was correct [in believing that she was not happy with her assignment during the 2007–2008 school year]." R. at 465–66. It is therefore not unreasonable for Mr. Roland to think that she would have been "happier" in a different position, particularly in light of the fact that Defendants intended to proceed with the transition to the full inclusion model—a model to which Ms. Duvall was openly

16

opposed.

Moreover, Ms. Duvall's "happiness" was not the only reason given by Mr. Roland for her transfer. Rather, Mr. Roland also stated that he believed transferring Ms. Duvall "would greatly benefit . . . her students[] and the school." *Id.* at 475. The school was committed to transitioning to a full inclusion special education model, and given Ms. Duvall's lack of support and resistence to this model, it was reasonable for Mr. Roland to believe that the school and students would be better served by transferring Ms. Duvall to a teaching position outside of the special education program. Accordingly, the school had multiple legitimate reasons for transferring Ms. Duvall—only one of which was Ms. Duvall's happiness—and there is no evidence to support Ms. Duvall's contention that Mr. Roland did not genuinely believe the school and students would be better served by transferring Ms. Duvall to a first grade position.

Based on the foregoing, Ms. Duvall has not established that Mr. Roland's and the District's explanation for her transfer was unworthy of belief or "pretextual." As such, the district court correctly granted summary judgment to Mr. Roland and the District on Ms. Duvall's claim of retaliation under § 504 of the Rehabilitation Act.

**B**

We turn next to Ms. Duvall's claim that Defendants retaliated against her in

17

violation of the First Amendment. "The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). They retain a constitutional "right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* "In determining whether [Defendants] impermissibly retaliated against [Ms. Duvall] in violation of her First Amendment rights, we apply the test from *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and *Connick v. Myers*, 461 U.S. 138, 147 (1983)." *Reinhardt*, 595 F.3d at 1135. This test, called the "*Garcetti/Pickering* analysis," has five prongs:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). Typically, "[t]he first three 'prongs' are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the fact finder." *Id.*

We begin by addressing the first prong of the *Garcetti/Pickering* test—i.e., whether Ms. Duvall's speech was made pursuant to her official employment duties. Ms. Duvall argues that she was speaking as a member of the general

18

public, as opposed to pursuant to her official duties, when she communicated her concerns about the District's decision to transition towards a full inclusion model to her supervisors and the State Department of Education Personnel. *See* Aplt. Supp. Opening Br. at 30. Additionally, with respect to her communications to parents, she asserts that "[n]othing under state or federal law . . . required her to notify the parents that she believed the policy adopted by the School District and its specific application to certain students violated federal law by ignoring the student's individual needs." *Id.* at 33.

In contrast, Defendants argue that Ms. Duvall's "speech to her supervisors complaining about the services provided to special education students is clearly speech taken pursuant to her official duties." Aplee. Supp. Br. at 33. Additionally, they contend that her "preparation and attachment of Letters of Dissent was absolutely a part of her official duties as a special education teacher participating on the IEP team and completing IEP's and was likewise not protected speech" because "her obligation to dissent arose from and existed solely because of her employment as a teacher and the duties associated with such employment." *Id.* at 34. Finally, they assert that Ms. Duvall "submitted no evidence that anyone from [the] District, including [Mr.] Roland or [Ms.] Iven, [was] aware that she had conveyed her views about the impropriety of the inclusion model to anyone other than District personnel." *Id.* at 35.

19

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. We have previously "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1324 (10th Cir. 2008) (citation omitted) (internal quotation marks omitted). It can include speech that "deals with activities that the employee is not expressly required to perform." *Id.* (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1203 (10th Cir. 2007)) (internal quotation marks omitted). "The guiding principle is that speech is made pursuant to official duties if it involves 'the type of activities that [the employee] was paid to do.'" *Chavez-Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010) (alteration in original) (quoting *Green v. Bd. of Cnty. Comm'rs*, 472 F.3d 794, 801 (10th Cir. 2007)).

Based on the foregoing principles, we agree with the district court's conclusion that Ms. Duvall's speech to her supervisors and other individuals within the District was undertaken in the course of her official duties. Ms. Duvall does not dispute that part of her responsibility as a special education teacher was to ensure compliance with state and federal law. Moreover, when asked during her deposition whether she believed it was part of her job "to point out to the

20

administration [her] concerns about potential legal violations by implementing

. . . or changing the IEPs as [she was] directed," Ms. Duvall responded: "[Y]es, I

do believe it is a job of a special ed teacher."  R. at 462–63.  Similarly, Ms.

Duvall's communications to parents regarding her concerns about the special

education model were also within the scope of her job responsibilities, as it is

undisputed that Ms. Duvall's job obligations included writing letters of dissent.

Accordingly, Ms. Duvall has failed to satisfy the first prong of the

*Garcetti/Pickering* test with regard to any communications she made to her

supervisors or to parents of children in the District.

However, we conclude that Ms. Duvall has arguably satisfied the first

prong of the *Garcetti/Pickering* test with regard to her communications to the

State Board of Education, as these communications were to individuals outside

her chain of command and went beyond the scope of her official job duties.  That

being said, we agree with the district court's conclusion that "[e]ven if [Ms.

Duvall's] First Amendment claim survived the first three steps of the

*Garcetti/Pickering* analysis, it would nonetheless fail at the fourth step because of

lack of evidence of causation."[7]  *Id.* at 1482.

---

[7]    The district court did not address the second and third prongs of the
*Garcetti/Pickering* test in its ruling, and the parties do not address either of these prongs
on appeal.  Because the parties have thus waived any arguments relating to the second
and third prongs—and because we find the first and fourth prongs to be

(continued...)

21

"Under the fourth-prong of [the *Garcetti/Pickering* test], [Ms. Duvall] bear[s] the burden of establishing both a detrimental employment decision (adverse employment action) [i.e., allegedly, the transfer] and causation—that is, that the constitutionally protected speech was a substantial motivating factor in [Defendants'] decision to [transfer her]."[8] *Couch v. Bd. of Trs. of Mem'l Hosp.*, 587 F.3d 1223, 1236 (10th Cir. 2009) (quoting *Maestas v. Segura*, 416 F.3d 1182, 1188 & n.5 (10th Cir. 2005)) (internal quotation marks omitted). "An employer's knowledge of the protected speech, together with *close* temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment." *Maestas*, 416 F.3d at 1189; *see also*

---

[7](...continued)
determinative—we limit our analysis to the first and fourth prongs of the *Garcetti/Pickering* test. *See United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011) ("It is well-settled that '[a]rguments inadequately briefed in the opening brief are waived.'" (alteration in original) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998))); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

[8]      Ms. Duvall argues that "the question of causation is ordinarily one for a jury to decide[,] [and] the District Court preemptively ruled" on it. Aplt. Supp. Opening Br. at 36. However, as the district court correctly noted, "[a]lthough the jury ordinarily resolves step four, the court can consider it when there is no evidence in the record from which a trier of fact could reasonably conclude that the employee's speech was a motivating factor in the detrimental employment decision." R. at 1482 n.30; *see also Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 750 (10th Cir. 2010) ("Although [the fourth] step is ordinarily resolved by the trier of fact, there simply is no evidence in the record from which a trier of fact could reasonably conclude the . . . speech was a motivating factor in [plaintiff's] termination." (citation omitted)).

*Rohrbough*, 596 F.3d at 750 (concluding that the plaintiff failed to meet the fourth prong where she had presented "no evidence whatsoever that [she] told [her supervisor] . . . of her [speech]"). "Other evidence of causation may include evidence the employer expressed opposition to the employee's speech, or evidence the speech implicated the employer in serious misconduct or wrongdoing." *Maestas*, 416 F.3d at 1189 (citation omitted).

Here, Ms. Duvall has failed to produce any evidence establishing that Defendants were aware of her alleged communication of her views regarding the District's full inclusion model to the State Department of Education. Although Defendants knew Ms. Duvall had "consulted with [the] State Department of Education Personnel," R. at 882, there is no evidence concerning the content of these communications. Thus, while the record establishes that Ms. Duvall "consulted" with the State Department of Education, it does not establish that she communicated her views on the full inclusion model to the Department. And, even if Ms. Duvall did communicate her views on the full inclusion model to the State Department of Education, there is absolutely no evidence establishing that Defendants knew of the content of these communications. Therefore, it ineluctably follows that Ms. Duvall's statements to the State Department of Education could not have been a motivating factor in any adverse employment action, as Defendants were unaware of the content of any such communications.

23

Accordingly, Ms. Duvall has failed to establish causation under the

*Garcetti/Pickering* test, and the district court properly granted summary judgment

to Defendants on Ms. Duvall's First Amendment claim of retaliation.[9]

### III

For the foregoing reasons, we affirm the judgment of the district court.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

---

[9] Because we conclude that the district court's grant of summary judgment in favor of Defendants was proper, we need not reach Defendants' alternative argument that Ms. Iven and Mr. Roland were entitled to qualified immunity.

11-6250, *Duvall v. Putnam City School District No.1*

**MARTÍNEZ,** District Judge, joining in part and dissenting in part.

In my view, there are present in this case genuine issues of material fact which preclude summary adjudication of Plaintiff's Rehabilitation Act claim in favor of Defendants-Appellees Putnam City School District No. 1 (the "District") and Principal Lee Roland ("Mr. Roland"). There are also disputed material facts on the record before us which prevent entry of summary judgment in favor of all Defendants on Ms. Duvall's First Amendment claim. Accordingly, I join the majority in affirming the district court's judgment in favor of Assistant Principal Marjorie Iven ("Ms. Iven") on Ms. Duvall's Rehabilitation Act claim. With regard to the remainder of the majority's opinion and judgment, I respectfully dissent.

**I.**

As her initial claim, Plaintiff-Appellant Louise Duvall asserts that she was subjected to unlawful retaliation on the part of Defendants, in violation of § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (the "Act"). Ms. Duvall points to two employment actions which she argues were materially adverse to her and in violation of the Act: (1) the letter of admonishment she received from Ms. Iven on October 25, 2007; and (2) her reassignment to a general education first grade position by Mr. Roland. I concur with my colleagues' determination that the subject letter of admonishment did not on these facts constitute an adverse action,

because the letter did not affect Ms. Duvall's work conditions or materially affect her employment.  I also agree that it necessarily follows that the district court properly granted summary judgment in favor of Defendant-Appellee Marjorie Iven, because Ms. Duvall has not identified any other allegedly adverse action that can be attributed to Ms. Iven.  Manifestly, therefore, Ms. Duvall has failed to make out a prima facie claim of retaliation under the Act as against Ms. Iven.

I also agree with the majority's conclusion that Ms. Duvall's involuntary reassignment to a lower paying, regular (non-special) education, first grade teaching position did constitute an adverse employment action under the Act.  Given our prior decisions holding that involuntary transfers of employees which result in a loss of compensation constitute adverse employment actions under federal anti-discrimination statutes, we could hardly have concluded otherwise. *See, e.g.*, *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003) (involuntary transfer was an adverse employment action under Title VII despite identical wages, seniority and title, because evidence showed that "the reassignment resulted in a *de facto* reduction in responsibility and required a lesser degree of skill"); *James v. Sears, Roebuck & Co., Inc.*, 21 F.3d 989, 993 (10th Cir. 1994) (although job reassignment is generally not a demotion constituting an adverse employment action under the ADEA, "a reassignment may involve a demotion if the employee will be paid less in the new position").

I fully agree, moreover, with the majority's determination that, with regard

2

to the involuntary transfer of Ms. Duvall, she has made out a prima facie case of retaliation under the Act as to Mr. Roland and the District. As they were required to do in these circumstances, Mr. Roland and the District have proffered what they assert was their legitimate, nonretaliatory reason for Mr. Roland's reassignment of Ms. Duvall – that he "believed she would be happier and more comfortable in [a first grade] position and that such a move would greatly benefit her, her students, and the school." R. at 475.

Our prior decisions make clear that "[t]o establish a genuine issue of material fact as to pretext, [Ms. Duvall] must demonstrate that [Mr. Roland's and the District's] 'proffered non-discriminatory reason is unworthy of belief.'" *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1134 (10th Cir. 2010) (quoting *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009)). As the majority points out, Ms. Duvall "can meet this standard by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Pinkerton*, 563 F.3d at 1065) (internal quotation marks omitted). Among other things, in evaluating whether the employer's asserted rationale was or was not a pretext for discrimination, we need to consider whether the employer "honestly believed those reasons and acted in

3

good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds as recognized in Boyer v. Cordant Tech., Inc.*, 316 F.3d 1137, 1140 (10th Cir. 2003).

I disagree with the majority's determination that Ms. Duvall has failed to come forward with evidence sufficient to create a material dispute on the question of whether the District's proffered reasons for its decision to reassign her were pretextual. With regard to the primary reason the Defendants say they transferred Ms. Duvall– that she would have been "happier" teaching first grade – Plaintiff has pointed to credible, material evidence in the record which directly calls into question the plausibility and believability of this rationale.

In the first instance, in order to accept this particular explanation as the District's non-discriminatory reason for its transfer decision, one would have to believe that Ms. Duvall eagerly anticipated not only being transferred away from special education - the field to which she had dedicated her entire professional career - but also that she welcomed reassignment to a position that paid her appreciably less compensation.

The majority posits that this explanation is indeed entirely credible, given that Ms. Duvall supposedly testified at her deposition that she was unhappy in her current position – with the implication therefore being that she would (or should) have been "happy" with a reassignment to a lower-paying first grade teaching position. A careful review of Ms. Duvall's deposition testimony reveals,

4

however, that she in fact never testified that she was unhappy in her position. Ms. Duvall's testimony is actually quite different: she stated under oath that her unhappiness was *not* with her job (which she had held for 29 years, and had previously provided her with a great sense of professional pride and satisfaction), but with the fact that she believed her "children [we]re not being properly served" and that she had been forced to work in "conditions . . . that I believed to be illegal." R. 6-20.

With this clarification it is clear that what would have made Ms. Duvall "happy" was for Defendants to have rectified the sources of her complaints – and not, as the District and Mr. Roland argue, for Defendants to involuntarily reassign her to a position with lower compensation and outside her field of professional concentration. From this perspective, moreover, not only does the District's and Mr. Roland's proffered rationale become less reasonable, in my judgment it lands squarely in the realm of implausibility and incoherency. In my view these competing views of Defendants' alleged rationale for the involuntary transfer of Ms. Duvall – as reasonable or implausible – can only be resolved by the trier of fact, after an opportunity to assess the credibility and demeanor of the witnesses with personal knowledge of the key events in question.

The majority relies heavily on our statement in *Bullington*, 186 F.3d at 1318, that when evaluating pretext, the relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether the employer

5

"honestly believed those reasons and acted in good faith upon those beliefs." In my view this question necessarily incorporates a test of reasonableness. *See Reinhardt*, 595 F.3d at 1134 (plaintiff can demonstrate pretext by showing weaknesses and implausibilities in the proffered non-discriminatory reasons such that a "reasonable factfinder" could find them "unworthy of credence"); *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (plaintiff can demonstrate pretext if "the employer's explanation was so weak, implausible, inconsistent or incoherent that a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for discrimination"); *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) (plaintiff can demonstrate pretext by showing that the proffered non-discriminatory reason was so incoherent and implausible as to be "unworthy of belief" in the eyes of a "rational factfinder").

Surely the trier of fact should be given the opportunity to assess the credibility of an employer who "honestly believes" a non-discriminatory rationale which is unreasonable. For instance, a trier of fact might legitimately question whether it would be reasonable and plausible for an employer in a race-based wage claim case to "honestly believe" that its African-American employees desired to be paid less than their similarly-situated Anglo colleagues.

There is, moreover, additional evidence in the record which buttresses my conclusion that it was unreasonable for Defendants to honestly believe that Ms. Duvall was happy about the transfer Mr. Roland was contemplating for her. For

6

example, it appears that on April 28, 2008, Mr. Roland first broached with Plaintiff the subject of her being transferred to one of two then-available regular education positions. R. at 1113. The next day, in an e-mail message to Glen Kastner, the District's Executive Director of Special Services, Ms. Duvall unequivocally stated that she had informed Mr. Roland "that I was not prepared to lose my 5% Special Ed. money." *Id.* Ms. Duvall went on in this e-mail to solicit of Mr. Kastner his assistance in locating for her "a good fit for my talents[,]" in a position clearly other than the two regular education positions Mr. Roland was then considering. *Id.*

Ms. Duvall also made clear her lack of acquiescence with the transfer Mr. Roland was considering for her by personally taking the initiative of seeking an entirely different type of transfer – to another special education position within the District. On the same day Plaintiff met with Mr. Roland to discuss his possible plans to transfer her to a regular education position, Ms. Duvall separately applied for a voluntary transfer of her choosing – to "any elementary or middle school *special education* Resource or Inclusion program." R. at 1647 (emphasis added). Given this sequence of events, I submit it was unreasonable for Defendants to believe that Ms. Duvall was happy about the prospect of being transferred to a regular education position – when all along she was attempting to prevent that very result by seeking a transfer to another special education position within the District. This evidence casts doubt on the plausibility of Defendants'

7

proffered rationale and buttresses Plaintiff's contention that she never sought or agreed to the involuntary transfer imposed upon her by Defendants.

Here, to summarily adjudicate Ms. Duvall's claim under the Act, we have to conclude that she eagerly desired and welcomed an opportunity to work for less pay, in a position she not only never sought, but one also far afield from her special education expertise – a skill set and knowledge base she had developed through many years of dedicated experience. In my view, for the district court to determine, solely on the papers before it and without a searching trial by jury, that it was reasonable and plausible for the District and Mr. Roland to "honestly believe" that Ms. Duvall sought such a result, was error. I would reverse the entry of judgment in favor of the District and Mr. Roland on Ms. Duvall's retaliation claim under the Act.[1]

---

[1] The majority briefly notes that in its view the District had multiple legitimate reasons for transferring Ms. Duvall, only one of which was Plaintiff's "happiness" over her involuntary transfer. From my reading of the parties' briefing on this issue, however, it is clear that Ms. Duvall's alleged delight in being transferred to a lesser-paying position is the central non-discriminatory rationale advanced by Defendants for effecting this employment action. We have previously recognized that where one allegedly pretextual rationale predominates over other reasons proffered by a Defendant for its conduct, a jury could reasonably find that the employer lacked credibility with regard to its remaining reasons, and as a consequence appropriately deny summary judgment. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1127 (10th Cir. 2005) ("It is not simply a question of how many of the defendant's reasons a plaintiff has refuted, but rather a question of whether casting doubt on a particular justification necessarily calls into doubt the other justifications. Where, as here, one of the stated reasons for termination predominates over the others, demonstrating that reason to be pretextual is enough to avoid summary judgment.") (internal citation omitted).

(continued...)

8

## II.

I turn next to Ms. Duvall's claim that Defendants retaliated against her in violation of the First Amendment. It is now well-settled in this Circuit that, when determining whether Defendants impermissibly retaliated against Ms. Duvall in violation of her First Amendment rights, we apply the test from *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), and *Connick v. Myers*, 461 U.S. 138, 147 (1983). As more fully detailed by the majority, this test, which has come to be referred to in the case law as the "*Garcetti/Pickering* analysis," has five prongs. As we have previously recognized, typically, "[t]he first three 'prongs' are said to be issues of law to be decided by the court; the last two are factual issues to be decided by the fact finder." *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009).

I concur with the majority's conclusion that "Ms. Duvall has arguably satisfied the first prong of the *Garcetti/Pickering* test with regard to her communications to the State Department of Education (the "Department"), as these communications were to individuals outside her chain of command and went beyond the scope of her official job duties." Where I part ways with my colleagues is in regards to their conclusion that even if Ms. Duvall's First Amendment claim survives the first three steps of the *Garcetti/Pickering* analysis,

---

[1](...continued)

9

it would nonetheless fail at the fourth step because of lack of evidence of causation.[2]

As applied to the facts of this case, under the fourth prong of the *Garcetti/Pickering* test, Ms. Duvall has the burden of establishing that her communications to the Department were a substantial motivating factor in Defendants' decision to involuntarily transfer her to a regular first grade teacher position. *Couch v. Bd. of Trs. of Mem'l Hosp.*, 587 F.3d 1223, 1236 (10th Cir. 2009). "An employer's knowledge of the protected speech, together with close temporal proximity between the speech and challenged action, may be sufficiently probative of causation to withstand summary judgment." *Maestas v. Segura*, 416 F.3d 1182, 1189 (10th Cir. 2005) (internal quotation marks omitted). "Other evidence of causation may include evidence the employer expressed opposition to the employee's speech or evidence the speech implicated the employer in serious misconduct or wrongdoing." *Id.*, 416 F.3d at 1189.

I respectfully disagree with the majority's determination that Ms. Duvall has failed to produce any evidence that Defendants were aware of her communications with the Department regarding her views on the subject of the District's new "full inclusion" teaching model. As the majority itself concedes, Defendants knew Ms. Duvall had "consulted with the State Department of

---

[2] As did the majority, I, too, limit my analysis to the first and fourth prongs of the *Garcetti/Pickering* test.

10

Education Personnel." R. at 882. The majority grounds its finding of a lack of causation on its conclusion that there is no evidence in the record before us concerning the content of these communications. But the record does not bear this out.

In a rebuttal letter dated November 2, 2007 and addressed to Assistant Principal Iven, Ms. Duvall outlined her reasons for rejecting the assertions contained in Ms. Iven's Letter of Admonishment. R. at 1641-42. In specific response to Item No. 2 set forth in the October 25, 2007 admonishment letter [R. at 550], Ms. Duvall expressly stated the following:

> I have consulted with State Department of Education Personnel and have studied the directives in the Policy and Procedures Manual for Special Education in Oklahoma, (Unofficial Draft Copy 2007). *Both sources provided the direction I followed in writing my Letter of Dissent.*

R. at 1641, emphasis added.

Ms. Duvall's "Letter of Dissent" was the October 3, 2007 letter she authored and addressed to Special Services Executive Director Kastner. R. at 1632. In that correspondence, Ms. Duvall explained to Mr. Kastner that her Assistant Principal had changed her special education teaching assignments from the pull-out services model to the full inclusion model. *Id.* Most importantly for our purposes here, in this letter Ms. Duvall also made clear to the District's Executive Director that she was requesting written confirmation from Mr. Kastner

11

that the District's new special education teaching model was not "breaking any state or federal guidelines." *Id.*

Defendants do not deny they received and were aware of both the October 3, 2007 and November 2, 2007 letters written to the District by Ms. Duvall. When read together, these two letters establish that prior to Ms. Duvall's involuntary transfer, the Defendants were privy to at least the following information: (a) Ms. Duvall had consulted with the Department; (b) someone(s) in the Department provided Ms. Duvall with "the direction[s]" she followed when she prepared her "Letter of Dissent;" and (c) Ms. Duvall's "Letter of Dissent" raised the issue of a possible violation of federal or state law as a result of the District's adoption of the new "full inclusion" model for its special education classrooms. R. at 1632 & 1641.

At a minimum, therefore, there is at least a genuine issue of material fact in regards to whether Ms. Duvall communicated her views on the full inclusion model to the Department, as well as whether such communications and their content were known to Defendants before they took their adverse employment action against Plaintiff. I conclude that a trier of fact might very well find, on these facts, that Ms. Duvall's statements to the Department were a motivating factor in the Defendants' subsequent decision to involuntarily transfer her. As a consequence, in my judgment it was error for the district court to determine that

12

Ms. Duvall failed to establish causation under the fourth prong of the *Garcetti/Pickering* test.  I would accordingly reverse the district court's grant of summary judgment to Defendants on Plaintiff's First Amendment claim.

### III.

Given my conclusion that the district court's grant of summary judgment in favor of Ms. Ivan and Mr. Roland on Ms. Duvall's First Amendment claim was in error, the individual Defendants' alternative argument that they are entitled to qualified immunity would need to be addressed.  As a consequence, I would reverse the district court's judgment on Ms. Duvall's First Amendment claim, and remand with instructions that the district court determine in the first instance whether Ms. Iven and/or Mr. Roland are immune from liability on the constitutional claim. *Murphree v. US Bank Of Utah, N.A.*, 293 F.3d 1220, 1223 (10th Cir. 2002) (where trial judge did not consider the issue of qualified immunity, the district court must evaluate it on remand); *England v. Hendricks*, 880 F.2d 281, 285 (10th Cir. 1989) ("It does not appear on the record before us whether the trial judge considered the issue of qualified immunity, and the issue is not presently before us. We will remand to the district court for a determination of qualified immunity.").